Filed June 9, 1893.

---

No. 16,972.

IN RE PETITION OF LEACH, EX PARTE.

134 665
148 48
148 49

ATTORNEY AT LAW.—*Women Entitled to Practice in Courts of Justice.— Constitution and Statute Construed.*—The right to practice law in the courts of justice of this State is not denied to women either by the constitution or laws of the State; and upon application and proper evidence, they are entitled to admission to practice in the courts of justice. Section 21, of article 7, of the State constitution, and section 962, R. S. 1881, construed.

In Re Petition of Leach, Ex Parte.

STATUTORY CONSTRUCTION.—*Presumption of Law*.—The legal presumption is against, and puts upon their defense, all restrictions upon human liberty and all claims for special privileges.

From the Greene Circuit Court.

*J. S. Bays*, for appellant.

HACKNEY, J.—The petitioner made an application in the lower court for admission as a member of the bar of said court, to practice as an attorney at law therein.

The special finding of the court discloses, that the petitioner, a citizen of this State, is a woman over the age of twenty-one years, and of good moral character; that she possesses sufficient knowledge of the law to qualify her to practice in the courts of this State, and that she sought the required oath as a member of said bar.

Upon the facts stated, the court found as a conclusion of law that the petitioner, not being a voter, should be denied such admission. The appeal herein presents the question of the correctness of this conclusion.

It is said that the lower court based its conclusion upon section 21, article 7, of the State constitution, which is as follows: "Every person of good moral character, being a voter, shall be entitled to admission to practice law in all courts of justice."

In addition to this provision of the constitution, the Legislature has enacted that "Every person of good moral character, being a voter, on application, shall be admitted to practice law in all the courts of justice." (R. S. 1881, section 962), and providing a procedure in establishing the right of such persons to be admitted to practice.

It will be observed that neither the constitution nor the statute is a limitation upon the right to membership. In each instance, as far as we have quoted, the right of the voter of good moral character is secured.

We do not doubt the right by the constitution, or by legislative enactment, to prescribe the qualifications necessary to membership in the legal profession, and to define the method of securing such membership; but what we now maintain is, that from neither the constitution nor legislative enactment, do we find that women are excluded from such membership. While voters of good moral character are granted admission, upon application and proper evidence, there is no denial of such right to women. If the right is not denied by the constitution and laws of the State, we should next inquire if it is denied by that part of the common law made, by the constitution, a part of the law of this State.

We have searched in vain for any expression from the common law excluding women from the profession of the law.

Custom and the usages of Westminster Hall granted permission to men. Some of the early statutes of England granted the privilege to men who, upon examination by the justices, were found to be "good and virtuous and of good fame," and when they should be "sworn well and truly to serve in their offices, and especially that they make no suit in a foreign country," but the letter of such statutes did not exclude women. The custom and usages of Westminster Hall were incident to the prevailing order of society, that to the domestic sphere only did the functions of womanhood belong; that woman had, and could have, no legal existence apart from her husband; that she could not engage in business on her separate account, could make no contract without the consent of her husband; that her separate earnings belonged to her husband; that woman, from the delicacy of her nature, was unfitted for the activities of the sphere occupied by men. Such of these fictions as became a part of the law of this country are rapidly disappearing,

and few, if any, of them exist in Indiana. It need not be considered whether we have adopted the customs and usages of Westminster Hall as a part of our common law. If they were the incidents of these fictions, they have vanished with the fictions. The other learned professions of this State are open alike to the sexes. There is no reason for an exception of the legal profession. If nature has endowed woman with wisdom, if our colleges have given her education, if her energy and diligence have lead her to a knowledge of the law, and if her ambition directs her to adopt the profession, shall it be said that forgotten fiction must bar the door against her?

Whatever the objections of the common law of England, there is a law higher in this country, and better suited to the rights and liberties of American citizens, that law which accords to every citizen the natural right to gain a livelihood by intelligence, honesty and industry in the arts, the sciences, the professions, or other vocations. This right may not, of course, be pursued in violation of laws, but must be held to exist as long as not forbidden by law.

We are not unmindful that other States, notably Illinois, Wisconsin, Oregon, Maryland, and Massachusetts, have held that in the absence of an express grant of the privilege it may not be conferred upon women. In some instances the holding has been upon constitutional provisions unlike that of this State, and in others upon what we are constrained to believe an erroneous recognition of a supposed common law inhibition. However, each of the States named made haste to create, by legislation, the right which it was supposed was forbidden by the common law, and thereby recognized the progress of American women beyond the narrow limits prescribed in Westminster Hall.

As was said by the Supreme Court of the United States,

in *Cummings* v. *State of Missouri*, 4 Wallace, 277, on p. 321, "the theory upon which our political institutions rest is, that all men have certain inalienable rights; that among these are life, liberty, and the pursuits of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one, and that in the protection of these rights all are equal before the law."

Before the law, this right to a choice of vocations can not be said to be denied or intended to be abridged on account of sex. Certainly the framers of our constitution intended no such result, and surely the Legislature entertained no such purpose. Instead of such results having been intended in this State, we find the constitution declaring that such rights are inalienable. Article 1, section 1.

Bearing in mind these inalienable rights, it is not possible for us to believe that the constitution was adopted, and the legislation enacted, in reliance upon any supposed rule of the common law which would exclude women from the enjoyment of any of such rights. We can not believe that the law of this State was intended, by fixing the qualification for legitimate vocations of one class of citizens, to entirely exclude another class.

The constitution of the United States provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of a citizen."

Our constitution and laws were enacted presumably in obedience to this command of the federal constitution. If not in disregard of this command, we can not presume that it was intended to prescribe a qualification for the admission of men and to enforce the supposed rules of the common law for the exclusion of women, thereby abridging their privileges as citizens. Instead of any such disregard for the rights of citizens, we find that the

State constitution, article 1, section 23, provides that "the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

Citizenship belongs to women, and it will not be denied that they are within the letter and the spirit of this provision. We do not cite these provisions of the federal and State constitutions for the purpose of establishing conflict, nor for the purpose of giving them new interpretation, but for the purpose of exhibiting the fallacy of that contention which holds the absence of legislation securing the right of women to practice in courts of justice as disclosing the reliance of the Legislature upon common law rules excluding her from so practicing.

The fact that the framers of the constitution, or the legislators in enacting our statute, did not anticipate a condition of society when women might desire to enter the profession of law for a livelihood, can not prevail as against their right to do so independently of either. As said by the Supreme Court of Connecticut, in considering this question: "If we hold that the construction of the statute is to be determined by the admitted fact that its application to women was not in the minds of the legislators when it was passed, where shall we draw the line? All progress in social matters is gradual. We pass, almost imperceptibly from a state of public opinion that utterly condemns some course of action to one that strongly approves it. At what point in the history of this change shall we regard a statute, the construction of which is to be affected by it, as passed in contemplation of it?" *In re Mary Hall*, 50 Conn. 131.

Our position is not that the constitutional and legislative grants of power to practice were adopted with a view to including women, but that such provisions simply affirmed the right of the voter without even an implied

denial of it to women.   Whatever disabilities existed as to married women, under the common law, they did not affect the rights of unmarried women; and now that married women are under no legal disability in this State, as to choice of honorable pursuits, both are to be considered as occupying the same position before the law.

The fact that neither has chosen the legal profession before in this State, is no reason for holding that neither may not do so, and, as further said in the case last quoted from:   "We are not to forget that all statutes are to be construed, as far as possible, in favor of equality of rights. All restrictions upon human liberty, all claims for special privileges, are to be regarded as having the presumption of law against them, and as standing upon their defense, and can be sustained, if at all by valid  legislation, only by the clear expression of clear implication of the law."

*In re Thomas*, 27 Pac. Rep. 707, the Supreme Court of Colorado held that in the absence of any statutory or constitutional inhibition, women are entitled to practice in the courts of justice.

Since the constitution and the act of the Legislature admit voters upon conditions prescribed, and since we hold that women may receive admission to the bar, it may be important to inquire by what rule of qualification shall women be admitted?   Under our constitution, judicial power is vested in the courts, and, as attorneys are officers of the court, are subject to the rules of practice in the court, and owe to the court admitting them a proper degree of rectitude, the power exists as one of the inherent privileges of the court, and as necessarily incident to its control over the membership of its bar, to prescribe all reasonable rules for the admission of persons desiring to practice; such rules, of course, not conflicting with the constitution and laws of the State.   So far, therefore, as to the admission of women, it is the privi-

lege of the court to prescribe such rules as to character and learning as may be deemed proper.

We conclude that the circuit court erred in refusing the appellant admission to the bar of said court, and the judgment thereof is reversed, with instructions to restate its conclusions of law, and for further proceeding in accordance with this opinion.

Filed June 14, 1893.